THE BERGEN NECK RAILWAY COMPANY, PLAINTIFF IN ERROR, v. THE POINT BREEZE FERRY AND IMPROVEMENT COMPANY, DEFENDANT IN ERROR.

1. On trial of an issue as to the damages sustained by the taking, for railroad purposes, of a strip of land lying west of the Morris canal, the landowner proved title to land which included the condemned strip, and extended thence eastwardly beyond the canal, subject, however, to the estate which the canal company should be presumed to have, on the mere fact of its being in peaceable possession of the canal. Thereupon the landowner offered testimony to show the expense and inconvenience which the railroad of the condemning company would occasion to the building and operation of a railroad from the owner's land lying east of the canal, to, over and beyond his land lying west of the canal. *Held*, that the presumptive title of the canal company excluded the right of the landowner to build a railroad across the canal, and that the offered testimony was illegal.

2. The trial court having erroneously ruled throughout the trial, up to the delivery of the charge to the jury, that the owner's lands lying east and west of the Morris canal formed one tract for the purpose of constructing a railroad across the canal, finally, in the charge, instructed the jury that for such purpose those lands did not compose a single tract, and that, in assessing damages for the taking of part of the westerly tract by a railway company, they must disregard the easterly tract. *Held*, that the error was not cured in time to save the substantial rights of the condemning company.

3. Mere connection with railroad corporations and knowledge of the value of the land will not qualify a witness to give his opinion before a jury on the expense and inconvenience attending the construction and operation of one railroad across another.

On error to the Supreme Court.

For the plaintiff in error, *Charles D. Thompson* and *Charles L. Corbin.*

This is a writ of error to review rulings on the trial of an appeal from an award in proceedings for condemnation.

The Bergen Neck Railway Company, by the proceeding, took a right of way one hundred feet wide, adjoining the right of way of the Central Railroad of New Jersey, and in so doing took a strip of land one hundred feet in width, and in length one hundred and nineteen feet on the east line and two hundred and sixty-three feet on the west line, from the Point Breeze Ferry and Improvement Company, containing three hundred and ninety-four one-thousandths of an acre. This parcel was part of a larger tract bounded north and south by lands of Currie, west by the Central Railroad of New Jersey, and east by the canal and land of the Morris Canal and Banking Company. The whole tract contains one and one-fourth acres, or sixty-five thousand five hundred and forty-two square feet, of which seventeen thousand one hundred and sixty-two square feet is taken, and forty-eight thousand three hundred and eighty square feet is left, as appears from the maps and from the description in the deed. The jury gave a verdict of $3,100 for land taken, being eighteen cents per square foot, and $11,297 for damages to land not taken, being at the rate of twenty-three and one-third cents per square foot, or to estimate per city lot the jury gave $450 per lot taken, and $583 for damages to each lot not taken. There were no improvements, and no material differences between the land taken and that not taken; and the jury gave more for damages to the land not taken than the whole value of the land, on their own estimate.

This extraordinary result is easily explained when we examine the rulings of the court in the admission of testimony. The landowner's case was presented entirely on the theory that damages should be allowed to a large and valuable tract of land on New York bay, partly reclaimed, which is sepa-

rated from that in question by the Morris canal. In spite of
the objections of the railway company, the court permitted
the owner to present the case, in the taking of testimony and
in the address to the jury, as one of damages to this riparian
tract of over one hundred acres, valued by one witness at
$700,000. The charge of the court was unexceptionable on
this point, but we protest that radical faults in the rulings of
the court, which involve a complete trial of the case on an
erroneous issue, and which are plainly embodied in the ver-
dict of the jury, cannot be tinkered up by a fair charge. A
fair trial is what we have a right to ask, and not merely a
fair charge.

By holding back the proper ruling until the charge, the
court permitted the counsel for the owner to sum up to the
jury on a false issue backed by the authority of the court,
and counsel for the railway company were also compelled to
take the law as the court had laid it down and make the best
of it, and to call witnesses to meet improper evidence, not
knowing that the view of the court had changed or would
change. No case can be properly presented in this way.
We will discuss this further under Point 5.

The history of the parcel is as follows:

It is a part of a large farm owned in 1846 by James Currie,
who conveyed in fee to the Morris Canal and Banking Com-
pany the strip of land on which the canal had already been
constructed, to have and to hold unto the canal company, its
successors and assigns, "so long as said land and premises
shall be used for the purpose of said canal."

At the same time with this deed, an agreement was made
between the parties for a drawbridge, to be built by the canal
company, at a point around the "elbow" of the canal, not
adjoining the tract now in question. This bridge was built,
but fell in 1848 when other bridges over the canal had been
built, and that in question was never rebuilt. The canal runs
here along the original shore line of New York bay, as the
maps show.

The Point Breeze Ferry and Improvement Company is a

company the stock of which is held almost entirely by the
estate and family of Currie. This company procured state
riparian leases in 1876 and 1879 to the lands under water
outside of the canal, with the assent of the owners of the
Currie estate. The lands on the upland side of the canal
were divided among the devisees of James Currie, and in the
division a tract, including that in question, was assigned to
Robert T. Currie, containing five and seven-tenths acres. He
confirmed the riparian title in 1875 by a deed to the Point
Breeze company, purporting to take in the entire bed of the
canal and two feet on the upland side of it; but, of course,
he could not give a title to land in the canal which he did
not hold.

The title being in this situation, the Bergen Neck Railway
Company located its line in 1885, and the fact became known
to the officers of the Point Breeze company in the latter part
of that year. Thereupon, in January, 1886, a deed was made
by Robert T. Currie, to the Point Breeze company, of the
tract now in question, containing about one and one-fourth
acres.

This transaction was a manifest device to work up a theory
of damages against the Bergen Neck Railway Company.
Robert T. Currie is a large stockholder in the Point Breeze
company. The tract conveyed by him to his company is
shaped into the likeness of a railroad curve, extended some-
what absurdly beyond the necessities of the case, so as to leave
an isolated triangle at the south corner of Robert Currie's lot,
where a proper tangent would have left none. The deed in-
cludes, besides land of R. T. Currie, a part of the Morris
canal, and advertises that the design is to connect the lands
and ferry privileges of the Point Breeze company with the
Central railroad.

The consideration in the deed is the preposterous sum of
$36,445. This was sworn to be the true price paid for the
land; but, on cross-examination, it appeared that this was
paid in seventy-five shares of stock, and $26,000 by purchase-

money mortgage, on which, by an understanding between the parties, no interest was ever paid, and no cash was ever paid.

With this elaborate preparation, counsel for the Point Breeze company avowed from the outset a claim of damages to the riparian tract, and the court permitted the value of that tract to be shown, and the owner's case to be presented on that basis, and on the theory that a valuable railroad connection was destroyed by the Bergen Neck railway. Counsel for the owner said at an early stage: "We will claim through the case that the canal constitutes no dividing line between our property in the sense of cases bearing on this point. But, as the case now stands, we have a complete record title from the Central railroad out to low-water mark.

"The court—With the canal crossing it?

"Mr. Lindabury—Yes, with the canal running across there."

The owner's maps showed the canal. Its character as a historic public highway was a matter of which the court was bound to take notice, and the deed by Robert T. Currie to the Point Breeze company expressly reserved the "easement" of the canal (in fact, it is not an easement, but a fee); yet the court apparently regarded the question as one for the jury to determine, and admitted evidence on the owner's theory, to which counsel for the company took numerous exceptions.

Classifying our exceptions for convenience we allege these errors:

*First.* The court permitted the owner to prove damages to the tract before the evidence showed what the tract was. Had the owner confined his evidence to the proper tract, this error would have been harmless, but he did not; and, further, after it appeared that the riparian tract was severed from that in question by the Morris canal, the court still admitted testimony on the theory that it must be taken into account in estimating damages.

*Second.* The court erred in admitting evidence to show damages for the interruption of a possible railroad connec-

tion between the riparian tract and the Central Railroad of New Jersey.

*Third.* The court erred in striking out testimony as to the good faith of the sale and of the price named in the deed by Robert T. Currie to the Point Breeze company.

*Fourth.* The court erred in improperly admitting opinions of experts.

## 1. WHAT IS THE TRACT?

This inquiry stands at the outset of every case of condemnation, and we venture to say that no case can be properly tried unless it is answered at the outset. It is a question for the court and not for the jury. Where the competency of evidence offered depends on facts which may be proved or disproved, it is the duty of the judge to try the question of competency and to decide it before letting the challenged evidence go before the jury, and to do otherwise is error. *Bartlett* v. *Smith,* 11 *Mees. & W.* 483; *Robinson* v. *Ferry,* 11 *Conn.* 460, 462; *Boyle* v. *Wiseman,* 11 *Exch.* 360; *Tayl. Ev.,* §§ 23, 24, 325; *Doe* v. *Davies,* 10 *Ad. & E.* 214, 323; *Gorton* v. *Hadsell,* 9 *Cush.* 508, 510; *Harris* v. *Wilson,* 7 *Wend.* 57.

A tract bounded by the land of others is clearly the only tract to be considered when part of it is taken, and in the present case there is no question of fact as to the tract to leave to the jury, but it is a question of law. *Currie* v. *Waverly and New York Bay Railroad Co.,* 23 *Vroom* 381, 392; *Potts* v. *Railroad Co.,* 119 *Pa.* 278, 284; *Lew. Em. Dom.,* §§ 474, 475.

There are exceptional cases where separate parcels are in actual connected use, with which the taking interferes. Such a case is *Poughkeepsie Railroad Case,* 63 *Barb.* 151, stated in *Lew. Em. Dom.,* § 475. There the use was connected; here there is only a scheme that the two parcels might be connected, and a speculation—theory—that if so connected it might be profitable.

The tract in question is entirely separated from the shore tract by the canal. The title held by the Morris Canal Com-

pany is a fee so long as used for a canal, and carries all the rights of every other fee while it endures. This form of deed was used in many grants to the canal company, and its force is settled by adjudications. *State* v. *Brown*, 3 *Dutcher* 13, 20; approved, 7 *Vroom* 550.

Such a grant deprives the grantor of the right to have a bridge under the canal charter, or to have any bridge at all unless reserved by the deed or a contract. *Brearley* v. *Delaware and Raritan Canal Co., Spenc.* 236.

In the present case, the only bridge reserved was at the elbow of the canal, south of the land in question, and was a drawbridge, and was long abandoned. Even where the charter right to a bridge exists, it applies only to the original construction, and no one can acquire a right to another bridge by buying part of the tract, whether on both sides of the canal or not. *Morris Canal Co.* v. *State*, 4 *Zab.* 62, 66; *Delaware, Lackawanna and Western Railroad Co.* v. *East Orange*, 12 *Vroom* 127, 130; *Morris Canal Charter, tit. "Bridges," Pamph. L.* 1824, *p.* 165, § 12; *Pamph. L.* 1828, *p.* 34, § 8.

The owner of a farm cannot designate where the bridge required by the charter shall be placed. *Ellsworth* v. *Central Railroad Co.*, 5 *Vroom* 93.

The bridges required by the charter are not railroad bridges, and therefore the canal company is under no obligation to permit a railroad crossing. *Lehigh Valley Railroad Co.* v. *Dover, &c., Railroad Co.*, 14 *Vroom* 528, 531; *Bridge Co.* v. *Hoboken Land Co.*, 2 *Beas.* 81; affirmed, *Id.* 503.

Even, therefore, if a present connected use of these vacant lands could in some manner be shown, the filled-in tract is not part of the tract in question, but is severed from it by the canal, which the owner has no right to cross, either by the canal charter or by the deed; and, under the General Railroad act, the jury cannot consider damages to any land save the tract between the Central railroad and the canal, a part of which is taken. *Pennsylvania Co.* v. *Railroad*, 151 *Pa.* 334, 338.

The result is that the tract of riparian land is to be treated

in this case precisely as if it were the land of another owner.. The court so charged. Had the court made this ruling when the testimony was offered, we should have had no ground of complaint, and nearly all of the testimony on the part of the owner would have been shut out. Assume that the owner had offered to show, as to lands of another owner, the facts. and opinions which were permitted to be shown as to this. riparian tract, and the improper character of the evidence will at once appear. The rulings will not bear this simple test of the rule that in these cases the plaintiff's "ownership of other lands is without legal significance." *Currie* v. *Waverly and New York Bay Railroad Co.*, 23 *Vroom* 392; *Fleming* v.. *Chicago, &c., Railroad Co.*, 34 *Iowa* 353, 357.

2. No damages should be allowed for the inter-
   ruption of a possible railroad connection with
   the Central railroad.

A switch connection with the Central railroad was made. hastily on the eve of condemnation, evidently to swell dam-- ages, and a railroad track was laid by the Central Railroad Company for a short distance across the right of way of the: Bergen Neck Railway Company, but was never used.

This connection was of no value because maintained at the will of the Central railroad, and such a right has no market, value. *Clapp* v. *Boston*, 133 *Mass.* 367; *Heyl* v. *Railroad*, 51 *Pa.* 469, 473, 474.

It was also without value because no right existed to cross the canal. The scheme of a railroad connection between the Central railroad and the riparian tract is not entitled to any consideration on the question of damages. As against any railroad company which may be organized to build such a railroad, the Bergen Neck company has a prior franchise. To make that company pay damages on the theory that a new company might be formed with power to bridge the canal, is. to make the prior company pay for damages to a franchise which may never come into existence, and which, if it were

created, would be subordinate and entitled to no damages at all. *Rochester, &c., Railroad Co.* v. *New York, Lake Erie and Western Railroad Co.,* 110 *N. Y.* 128, 133.

The scheme of a connection by the Point Breeze company of their riparian land with the Central railroad, is only feasible by the consent of the Morris Canal Company, and damages cannot be allowed when the right rests on such contingency. *Munkwitz* v. *Chicago, Milwaukee and St. Paul Railway Co.,* 64 *Wis.* 403 ; charge of Dixon, J., in *Packard* v. *Bergen Neck Railway Co.* (judgment affirmed on error),. 25 *Vroom* 553 ; *Watson* v. *Milwaukee and Minneapolis Railway Co.,* 57 *Wis.* 332, 351 ; *Powers* v. *Railway Co.,* 33 *Ohio* 429, 434.

The whole theory that the probable future use of the riparian tract is as a Central railroad terminus is a wild speculation, and still more fanciful is the theory that this undesirable route would be chosen as a means of access to that tract, while better routes exist to connect it with the Central railroad without crossing the canal at all.

If this owner could claim damages to his parcel as a route to connect the Central railroad with the shore, the next owner could set up the same claim with equal or perhaps better ground. Every owner for the five miles where the Bergen Neck railway intervenes between the Central railroad and the shore could claim $14,397 for each strip of seventy-five feet over his land. Not only must we assume to warrant the admission of such testimony as was admitted here, that each strip has a value as a route for a Central railroad branch to the shore, but also that when it shall be required for such use, the taker will pay more for it than it would bring for any other purpose. Of course the Bergen Neck Railway Company has not paid any such damages to a single other owner whether he held shore lands or not ; at that rate the route would cost $500,000 per mile. The Point Breeze company is not entitled to any favored rule of damages. To all suggestions of damages to possible future uses (and they are end--

less in variety) the law makes one answer, that the measure
of damages is diminution of present market value; it is never
the increased cost of some possible future improvement.

### 3. EXPOSURE OF MANUFACTURED EVIDENCE.

The court, after the counsel for the railway company had
proved that the deed to the Point Breeze company followed
close upon the knowledge by its directors of the filed route
of the railway company, ordered this testimony overruled.
This deprived the railway company of evidence competent to
show the manufactured character of the claim of damages,
and the worthlessness of the consideration in the deed to the
Point Breeze company as a piece of evidence. We think that
our evidence thus overruled was competent on two grounds.
First, it was a legitimate attack upon the evidence of this
witness as to the consideration stated in the deed; and second,
the *bona fides* of the railroad connection scheme was a proper
subject of inquiry and attack, and the evidence was pertinent.
*State, Jones, pros., v. Carragan*, 7 *Vroom* 52; *Schuylkill
Navigation Co.* v. *Farr*, 4 *Watts & S.* 362, 372.

### 4. OPINIONS OF EXPERTS.

The opinions of experts should be permitted only under
close restraint.

Otherwise experts simply go on the stand as paid counsel
to argue the case for their side. In the present case Mr.
Siedler and Mr. Harrison, neither of whom had any particular
knowledge of the market value of lands in the vicinity, were
allowed to deliver addresses to the jury to boom the damages.
The arguments which the ingenuity of counsel could devise,
were presented from the witness-box. And these witnesses
were permitted to ignore the existence of the canal, and to
assume that the parcel in question was a feasible route, actually
connecting the Central railroad with the riparian tract, and
were allowed to discuss the cost of constructing a railroad
from the Central railroad at grade, and above grade of the

Bergen Neck, to reach the riparian tract, and to reckon the annual cost of keeping a flagman at the imaginary crossing, &c., all reckoned in as part of our damages. The court permitted the owners to present their case, and claim damages precisely as if they were a railroad company, having a prior franchise, and an unbroken right of way actually connecting their shore land with the Central railroad. What more could they have proved than they did if such had been the case?

Speculations by experts as to possible uses and values, after improvements shall have been made, are not admissible, still less the cost of the improvements to adapt to such uses. *Packard* v. *Bergen Neck Railway Co.*, 25 Vroom 553, 565; *Pennsylvania S. V. Railway Co.* v. *Cleary*, 125 *Pa.* 442, 451; *Sixth Avenue Railroad Co.* v. *Metropolitan Elevated Railroad Co.*, 56 *Hun* 182, 185; *Watson* v. *Milwaukee and Minneapolis Railway Co.*, 57 *Wis.* 332, 351.

Opinions of witnesses are not admitted as to matters of general knowledge. *Thompson* v. *Pennsylvania Railroad Co.*, 22 Vroom 42; *Pennsylvania Railroad Co.* v. *Root*, 24 *Id.* 253; *Schuylkill River Railroad Co.* v. *Stocker*, 128 *Pa.* 233, 252.

Counsel for defendant in error, on the former argument, defended fully on the merits the soundness of three only of the rulings brought up by the assignments of error, namely, the eighth, twelfth and thirteenth, relying chiefly on the theory that the other errors were harmless or unavailable.

The eighth, twelfth and thirteenth assignments relate to the admission of expert testimony. The sixth and seventh were of the same general character, but counsel say that the sixth error was harmless, because the witness rambled away from the question and did not answer it. We submit that he did answer it, making just such an argumentative reply as may always be looked for when such a question is admitted and a witness is allowed to give his opinion of the damages to land not taken. The theory of damages which this expert advocated was a false one, but the very next question showed that the purpose of counsel by their questions was to draw

from this witness a statement of the very theory which he presented, namely, that the measure of damages should be the cost of a railroad bridge over the plaintiff's railroad. This last question, though admitted over exception, counsel declared that he withdrew after it had been answered—a device to bring improper evidence before a jury without risk, so unfair that we cannot believe it legal. Legal or not, the withdrawal cannot aid the defendant in error, for the reason that a later question was admitted on the same assumption, namely, that the cost of building a railroad bridge over the proposed railroad of plaintiff is to be considered in estimating damages, and that it is proper to prove it by the opinions of experts.

Another so-called expert (who had never bought or sold land in the vicinity) was asked the present value of the tract, and then the value of the land left after plaintiff should put the land taken to railroad uses. Now, a witness who knows the value of land might properly be asked the present market value of the remaining tract, and might thus include damages resulting from the severance, but it is quite another thing to call for an estimate, or, rather, a prediction, of the value which it will have in view of the railroad use of the land taken. The latter question calls for an estimate of the effect of the nuisance caused by a railroad. This was a material fact for the jury to find, but not for an expert to find for them. " On this subject all men stand on an equal footing." *Pennsylvania Railroad Co.* v. *Root*, 24 *Vroom* 253, 255. The witness answered like his associate expert by giving as the measure the cost of building a railroad crossing, and thereupon the court sanctioned this measure against exception by permitting the expert to elaborate his theory by stating what elements entered into the estimate. These are the rulings which counsel defend. We submit that they are glaring errors. These experts undertook and were permitted to give an opinion that the parcel taken would be needed someday for a railroad by the Point Breeze company, and to estimate the damages to this plot as equal to the cost of a

railroad bridge over the Bergen Neck railway. Some plain objections are that no man can be an expert on such a question as whether a railroad will or will not be needed; that the cost of a railroad bridge has no relation to market value, and would be the same whether the land taken or damaged was one acre or ten acres, and that it is not competent to prove by expert opinions the amount of the damages that will result from the operation of a railroad to the adjacent property. Permitting witnesses thus to estimate the damage and to support the estimate by argument, was error. *Packard* v. *Bergen Neck Railway Co.*, 25 *Vroom* 553, 565; *Laing* v. *United New Jersey Railroad Co., Id.* 576 ; *Boston, &c., Railroad Co.* v. *Old Colony Railroad Co.*, 103 *Mass.* 142, 147; *Roberts* v. *New York Elevated Railroad Co.*, 128 *N. Y.* 455, 472; *Missouri Pacific Railroad Co.* v. *Porter*, 112 *Mo.* 369; *Pennsylvania S. V. Railway Co.* v. *Cleary*, 125 *Pa.* 442, 451.

### 5. THE ERRORS CANNOT BE HELD HARMLESS.

Counsel for the railway company did not take exceptions to every improper question. The late Mr. Justice Knapp, while most scrupulous to preserve the right of review, always insisted very sensibly that counsel should be satisfied with a point once fairly made and should not waste time and interrupt the witnesses with a repetition of the same objection, and counsel deferred to his wishes with confidence that they would be fairly dealt with in the court of review. Abundant exceptions have been taken to raise every question presented by the assignment of errors.

Let us review the exceptions.

Evidence was admitted of the title of the Point Breeze company to the riparian tract by offering their state grants, of the cost of the improvements thereon and of the value of that property. All this is confessedly not proper evidence in the case.

Counsel for the Point Breeze company say that at the time this testimony was admitted, the court did not know that the

riparian tract was separated from the tract a part of which was taken. But this is an error. Objection was taken on that ground when the first title deeds of the riparian tract were offered, and exception was allowed to their admission. Then after objections were argued by counsel, counsel for the Point Breeze company went on with proof as to the cost and value, under exception at each step.

We have cited abundant authority in our brief that the court should have settled the question of the tract at the outset. In point of fact, the court did settle it erroneously in favor of the Point Breeze company. Although at first the court ruled with some reserve, the final disposition of the subject was made at a later stage of the case after full argument, with all the facts fairly before the court, and thenceforward it was received as settled throughout the taking of evidence. The court tried the case on the theory that the riparian parcel was a part of the tract damaged, and forced the Bergen Neck Railway Company to take testimony to meet that theory and its counsel to sum up on that theory.

Mr. Siedler, as an expert, was allowed to give his opinion whether there were damages to the residue of the tract and why, and in so doing he, of course, ran into a harangue to the jury, arguing that they ought to give damages for the destruction of a valuable railroad route to the shore. The same expert was then allowed to estimate damages on the theory of the use of the strip in question as a railroad connection of the Central railroad with the shore, and to include in his estimate a theory of damages, by which the Bergen Neck Railway Company must pay for a railroad bridge over the Central Railroad of New Jersey.

After some of this testimony had been admitted against exception, the answer to one question was stricken out on the application of the party offering it, but the court afterwards admitted further evidence of like character.

Then, as we have stated, the Point Breeze company offered a further grant from the state of lands under water, which the court admitted, possibly on the theory that the question

of the tract was for the jury. The court abandoned this theory in the charge, but did not expressly retract the rulings on the trial, and it is clear that the jury followed the latter.

Mr. Harrison was then permitted to testify as to the value and uses of the riparian land of the Point Breeze company, and to urge the value of the tract in question for a railroad route to connect the Central railroad with the riparian tract, and the damages from the taking, on the theory of increased expense to make the connection. He brought in cost of flagmen to protect the crossing, which he imagined to exist by the future Point Breeze railroad over the Bergen Neck railway, and gave a harrowing description of the accidents that were to happen there, and the cost thereof, and how much a company ought to pay to escape the danger, which the court supplemented by reference to the loss of life—all to be now paid for by the Bergen Neck railway, on the prospect that the Point Breeze may at some time have a railroad crossing there.

Was ever anything like this heard before in court, or anywhere else, except in the speeches of Colonel Sellers? Are we not clearly correct, when we say that the case was put in, by the sanction of the court, on the theory that the Point Breeze company had a substantial existing railroad connection between the Central railroad and the riparian tract, and that the railway company were destroying that connection?

If the Point Breeze land under water was filled in and available, and had docks and warehouses on it, and if they were carrying on business there, and if the business was profitable, and if the warehouses and docks were connected by a railroad with the Central railroad, and if a title to maintain the railroad across the Morris canal were shown, and if a contract were shown to maintain connection with the Central railroad; if all these things concurred, what further evidence could the court admit than was admitted in this case? The court has permitted the witnesses to imagine a railroad connection, and to prove against us damages for interrupting it, whereas, not only does no railroad exist, but the Point Breeze

company could not build it without crossing the land of another owner.

. The settled law as to such theories is, that they are too speculative to receive any consideration, and are matters not capable of proof by expert opinions.

See cases cited under Point 4, *supra.  Lew. Em. Dom.*, § 480; *Munkwitz* v. *Chicago, Milwaukee and St. Paul Railroad Co.*, 64 *Wis.* 403; *Powers* v. *Railway Co.*, 33 *Ohio* 429, 434; *Lake Shore Railroad Co.* v. *Cincinnati, &c., Railway Co.*, 30 *Id.* 604, 623.

Nowhere has evidence of the imaginative class been more effectively ridiculed than in our own reports in the case of *New Jersey Railroad Co.* v. *Suydam*, 2 *Harr.* 25, 34, 36, 37, 38, 44, 46, 47, 48.

Consider what the true rule of damages is—the difference between the market value of the tract before the taking and its market value after the taking. *Lew. Em. Dom.*, §§ 478, 479; *Moulton* v. *Newburyport Water Co.*, 137 *Mass.* 163; *Pennsylvania S. V. Railway Co.* v. *Cleary*, 125 *Pa.* 442, 451.

Test the oratory of Siedler and Harrison, by this rule, and what competent evidence is then in it? Does it show the market value of this strip of land to prove what a railroad bridge will cost, or whether such a bridge is cheaper than a grade crossing, and that the cost of maintaining a grade crossing on an imaginary railroad would be $50,000, yes, $60,000, now we come to think of it, for flagmen alone, or, on the whole, say $100,000, to avoid the dangers of collisions, all which it seems is, by some *hocus pocus*, to make this cheap, isolated strip worth $40,000 to the Bergen Neck Railway Company? This is the whole stock of the owner's testimony, and if such testimony is to be ruled in, we should like to know what rules of evidence are for.

But it is claimed that all these errors are wiped off the record by a paragraph in the charge that damages to the riparian tract should be disregarded, and that the testimony of the two experts, so far as it was based on the terminal tract, was inapplicable to the case. The language thus used was

qualified by the court by the statement that, so far as the testimony of these experts related to the market value of the land and the direct injury to the remainder of the tract, it was relevant and competent. This might well be understood by the jury to be an approval of some of the estimates of these experts, none of which were competent, such as the cost of a railroad bridge.

We have shown that the jury actually allowed for damages to land not taken, more per square foot than they gave for the land taken. Counsel respond that the land taken may have been much more valuable than that not taken, in the judgment of the jury, who had their view to rely on. The evidence was that it was less valuable. The evidence of value by the experts for the Point Breeze company was incompetent because on a false basis. The highest estimate by competent evidence as to value fixes it at a minimum of $300 per lot, at which rate the whole tract, part of which was taken, would bring less than $6,000. It is no answer to cite the view; the jury's verdict must be supported by the evidence, and cannot be sustained on the view alone. *Peoria Gas Co.* v. *Peoria Railroad Co.*, 146 *Ill.* 372, 381.

The question how far erroneous rulings on evidence can be corrected by the charge, has been much considered. In the United States Supreme Court, the rule stated by Mr. Justice Miller is this: "The farthest any court has gone has been to hold that when such court can see affirmatively that the error worked no injury to the party appealing, it will be disregarded." *Gilmer* v. *Higley*, 110 *U. S.* 47, 50, followed *Mexico* v. *Oliver*, 148 *Id.* 664, 673. Under this rule, the express direction of the court to disregard the improper testimony has been held in some cases to cure the error of its admission. A very sensible discussion of this subject is found in *Holmes* v. *Moffat*, 120 *N. Y.* 159, 161, where the court, referring to a single specific item of evidence improperly admitted, said to the jury: "I withdraw it from your consideration, as I do not believe it to be proper or material evidence." And the judge went on to say that his

attention had not been as carefully called to it as it should'
have been, and that it was not before the jury at all.    This-
was held to cure the error, there being other evidence war-
ranting the verdict, and counsel having been vague with their
objections, with a suspicion of having fished for an exception.
The retraction must be express and definite, otherwise we-
cannot tell which rulings the jury followed.    *Toledo, &c.,.
Railway Co.* v. *Shuckman*, 50 *Ind.* 42, 45.

Where the court is not satisfied that the error did no harm,.
the withdrawal will not cure the error.    Thus, in *Maxted* v.
*Fowler*, 94 *Mich.* 106, 112, a letter was admitted assailing the-
character of defendant.    It was afterwards stricken out by:
the court, but the appellate court said it was not conclusive-
that the impression did not remain with the jury.    " It is-
incredible that the purpose of plaintiff's counsel could have-
been other than to prejudice the jury."    We emphatically
repeat this language as to the purpose of counsel for the Point
Breeze company in this case.

In *Lentz* v. *Carnegie*, 145 *Pa.* 612, 627, the court properly-
charged the jury that damages from flooding should be limited'
to six years, but the judgment was reversed because evidence-
had been admitted of damages for more than six years.

The proper issue in this case, as the court ruled in the-
charge, was simply the damage to the market value of the
tract of one and one-fourth acres.    The issue on which the-
evidence was admitted was the damage to the riparian tract
of one hundred acres, and that, too, estimated on the false-
basis of the cost of a railroad bridge to reach it from the-
Central railroad.

In view of the fact that the whole presentation of the case-
by the Point Breeze company sustained by the court was both.
on a false issue and on a false theory of damages, how can
the court find no prejudice?

Was it not a prejudice to have professional boomers like-
Harrison and Siedler permitted to argue the cause from the-
witness-stand in favor of extravagant and unlawful damages?·
Was it not prejudice to compel counsel for the railway com--

pany to cross-examine on the theory that damages would be allowed to the outside tract, and to examine their own witnesses on the theory that damages from interruption of railroad connection with that tract must be paid for? What is the right to call witnesses worth if they must be examined on a different issue from that left to the jury?

And was it not a prejudice to the railway company that their counsel were compelled to present their case to the jury on the theory that damages would be allowed by court to the outside parcel? How could we know that the judge would change his opinion? What is the right to address the jury worth if counsel must address them on a false theory of the law? Counsel must take the law from the court, and the rulings of the court barred counsel from a proper argument to the jury. The right to adduce evidence and the right to address the jury on the proper issue are substantial rights, and errors which deprive a party of these rights cannot be called harmless.

To say that there was no prejudice is equivalent to saying that it matters not how much improper evidence the court admits provided the charge is correct. The verdict proved the prejudice.

The judgment should be reversed, and a *venire de novo* should be awarded.

For the defendant in error, *Frederic W. Stevens* and *Richard V. Lindabury.*

The case was this: The Point Breeze Ferry and Improvement Company was incorporated March 16th, 1854. *Pamph. L., p.* 360. It was authorized to receive conveyances of land, to construct docks, wharves and ferry-houses, and to establish and maintain a ferry between Point Breeze and the city of New York. By two leases from the state, dated respectively September 30th, 1876, and September 20th, 1879, it acquired a grant of lands under water in New York bay.

On May 9th, 1875, it acquired title from William Currie and Robert Currie to a strip of upland, which, in terms, took

in the bed of the Morris canal, together with the shore on the south of the canal and a strip two feet wide adjoining the canal on the north.

On January 28th, 1886, it acquired title to a semicircular strip of land one hundred feet in width by about eight hundred feet in length, carved out of the lot of R. T. Currie and extending from the Central Railroad Company's main line, southerly across the Morris canal, reserving in terms "the easement of the Morris Canal Company in and to the right of way over said tract as now occupied and used * * * for its canal and tow-path." At this point the canal company appear to have really acquired a base fee by deed made by James Currie in 1840.

The land taken by the Bergen Neck company out of the last-named strip was near its northerly extremity. A very narrow strip between the land taken by the Bergen Neck company and the lands of the Central Railroad Company was left.

The jury gave to the Point Breeze company $14,397. They unnecessarily declared the value of the land taken to have been $3,100 and the damages $11,297, and counsel takes hold of this attempt not to show error, but to create a prejudice because of this apportionment. This court, in *Packard* v. *Bergen Neck Railway Co.*, 25 *Vroom* 560, has very recently said: "The verdict of a jury on appeal is final, and no useful purpose will be served by separate findings in the verdict which are not expressly required by the act." The argument by which counsel seeks to create this prejudice is that the jury gave more per square foot for the land damaged than they did for the land taken. The whole argument rests, of course, on the assumption that all the land was of the same value. But the jury may well have thought that the land contiguous to the bay was more valuable because it was nearer tidewater. Moreover, the jury viewed the land and saw that a part of the tract condemned was low and would have to be filled in, whereas the residue of the land was high.

Another answer (if answer is needed) is that, the case

having been in the Circuit, an application for a new trial was made before Mr. Justice Knapp, where this very point was urged, and the application was denied on the merits.

The Point Breeze company had acquired a large tract of land under water. This land it had partly filled in at a cost of from $200,000 to $300,000. It naturally desired a connection with a through or trunk line like that of the Central railroad. This connection they made by purchasing from Robert Currie the semicircular strip in question at a cost of $36,446. We thought, and still think, that after this purchase it became possessed of one tract, whose parts were to be devoted to a single use, and which, under the decisions, constituted a unit for every purpose of condemnation. *Currie v. Waverly Railroad Co.,* 23 *Vroom* 391 ; *Lew. Em. Dom.,* § 475.

It was not only a unit because of the purpose to which it was devoted ; it was continuous in point of law. The Bergen Neck company had the reversionary interest contingent upon the determination of the base fee held by the canal company, and by agreement under seal, made contemporaneously with the deed given to the canal company, the latter executed an agreement under seal by which it stipulated that it would " build a drawbridge across the said canal near the tenant's house of the said Currie on the piers aforesaid." This bridge, though not to be constructed over the canal where the semicircular strip now intersects it, was but a short distance therefrom and on the two-foot strip deeded by William and Robert Currie, which was joined to the semicircular strip. If legal connection were, therefore, needed to join tracts, we have it here. I do not suppose that it will be contended that the covenant of the canal company does not still subsist ; that it is not a continuing contract. Certainly its binding force has never been denied, and nothing like adverse possession has been proved.

But this was not the theory on which Mr. Justice Knapp tried the case. He refused to take the view that the tracts

were one.    He distinctly and unequivocally took the opposite view.

In his charge he says:

" You estimate, then, in addition to the value of the land, a sum that will measure the injury which is done to the remaining tract, and I have said that tract here to be considered is the strip of land of an acre and a quarter lying between the Morris canal and the Central railroad.

" You do not regard the effect upon the land that lies easterly, that is not of the same tract, and for our purposes as if it were not owned by this company.    The inquiry in the matter of damages is limited entirely to that tract lying between the Morris canal on the east and the Central railroad on the west, less what is taken by this company and paid for as land."

Further on he says: "As to the other the same thing may be said, the damage resulting to that by reason of taking off this strip is to be estimated.    What the elements of damage are you will have to judge.    But in making that judgment you must disregard its relations to the land lying east of the canal.    It has no relation to that land in a legal sense."

And still further on he says: " In the trial of the case the land lying on the shore has played a conspicuous figure which I am not able to understand.    It is out of the case.    True, it belongs to the same owner, but it is a separate tract."

Again, in referring to the testimony of Messrs. Siedler and Harrison, he says: " So far as it [*i. e.*, their testimony] is based upon matters connected with the shore point, what has been called here the terminal tract, so far as it is based upon considerations of that, it is inapplicable to this case."

No wonder the counsel of plaintiff in error were forced to admit that the charge of the court was " unexceptionable." But this admission is fatal to their case.    For even if the court committed error during the trial (which I will show it did not on the theory of the case held by plaintiff in error), that error was cured by the " unexceptionable " charge of the judge.    No court has ever yet held that, because a judge

.makes a mistake in the admission or rejection of evidence, he cannot correct it as the case proceeds.

In *Kutzmeyer* v. *Ennis*, 3 *Dutcher* 371, it was held that the erroneous rejection of a copy of a contract offered in evidence constitutes no ground of reversal, if the original contract be afterwards admitted.

In *Mershon* v. *Hobensack*, 2 *Zab.* 373, and in *Delaware, Lackawanna and Western Railroad Co.* v. *Daily*, 8 *Vroom* 526, it was held that a judgment will not be reversed because the court improperly refused to nonsuit, if the evidence subsequently adduced is sufficient to sustain the plaintiff's case.

And in *Specht* v. *Howard*, 16 *Wall.* 564, it was held that, if improper evidence has been suffered by the court to get before a jury, it may properly withdraw it. In fact, any other rule would be intolerable.

So our courts have repeatedly held that error which does not injure the party objecting will not be ground for reversal. *Den* v. *Stalman*, 1 *Harr.* 68; *Schenck* v. *Cottrell*, 1 *Zab.* 8; *Rodenburg* v. *Roseberry*, 4 *Id.* 493; *Graham* v. *Whitely*, 2 *Dutcher* 260; *Freeman* v. *Bartlett*, 18 *Vroom* 34; *Humphrey* v. *Woodstown*, 19 *Id.* 591.

It is quite manifest that if the court admit improper evidence, and then afterwards, on further consideration, distinctly instruct the jury to disregard it, it can, in a legal sense, do the party no harm. It must be presumed that the jury follow the instructions of the court until it be shown to the contrary. The question, in that aspect, comes up on an application for a new trial, not on error. In the case in hand an application for a new trial was denied on the merits.

I deny that there was any error committed in admitting testimony, even on the theory of the case held by the plaintiff in error.

The case was tried on the principle established by *Currie* v. *Railroad Co.*, 23 *Vroom* 381. It is there distinctly held " the situation and surroundings of land sought for railroad purposes may impart to it a special value for such purposes generally. Where such a value is shown, the owner may

reap the benefit of it when compelled to part with his land by condemnation."

The land in question was situate on New York bay, separated from it only (if it was separated) by the Morris canal. It was testified to by Mr. Harrison that of the total frontage lying on the Hudson river and New York bay, from Weehawken to Bergen Point, eighty per cent. was held for permanent occupation for terminal and warehouse purposes, and only twenty per cent. remained in the hands of shore-owners. He further stated that the land of the Bergen Neck company, in process of reformation for terminal purposes, was the largest piece of terminal reclaimed land not then actively in use. If it be asserted that the semicircular strip of upland is not part of the terminal lands of the Bergen Neck railway (certainly a doubtful proposition in view of the fact that it adjoins or so nearly adjoins tidewater), still it cannot be denied that it and the lands adjoining it south of the Central railroad had a special value in that they served as the connecting link between the reclaimed lands and the main line of the Central railroad. How much its situation added to its value was for the jury to decide. Now, certainly it was competent to show the surroundings of the *locus in quo*, and the evidence objected to was evidence of this character. I think I may safely go further. The land in question had been selected and located with special reference to making the best possible connection between the reclaimed lands and the railroad. It possessed additional intrinsic market value on that account. It would have been, because of its peculiar shape, more expensive to acquire it from any owner, because of the injurious way in which it curved through his lands.

In the light of these facts, let us look at the specific exceptions filed. Passing over the first and second, which are so general as to mean nothing, the third objection is aimed at the admission of the lease of the lands under water by the state, and the tenth objection at the admission of the award of the riparian commissioners to the trustees of the Currie estate. In order to validate the offer of the lease, we had

to show the award. *Rev. Sup., p.* 985, § 19. This was the avowed and only purpose of offering it. It was so under-stood by the exceptants, who only accepted on the ground that the offer was incompetent because the tract was not con-nected. Now, certainly, by way of showing the situation and the surroundings, the evidence was relevant. The proposition of the other side was that the circular strip was only valuable for small and inexpensive building lots. Was it not compe-tent for us to show that it possessed a much greater value as a connecting link between the reclaimed lands and a great railway system, and that it had actually been acquired and paid for to that end? We were compelled to show the own-ership of the reclaimed lands in order to show that their owner had seen fit to acquire the strip in question as an adjunct to his lands. The evidence was admitted for this purpose; its reception then could not be error; and there is another principle applicable here. It was held by this court in *Schenck* v. *Griffen,* 9 *Vroom* 471, that "in almost every case of controverted facts an infinite variety of extraneous circumstances may be suggested which may bear remotely upon the issues involved. The admission of the proof of such circumstances must be left to the discretion of the judge; * * * on error its rejection or admission is no ground for reversal."

I respectfully ask whether proof that the Point Breeze company was the owner of the reclaimed lands, and had pur-chased the strip in question to enable it to make a connection with the Central railroad, was not entirely legitimate when coupled with a most explicit instruction from the judge that the inquiry as to damages must be limited entirely to the tract lying between the canal and the railroad. Precisely the same considerations apply to the fourth assignment of error. Of course proof of improvements on the surrounding lands would bear upon the value of the *locus in quo.*

It is a cardinal rule, often laid down by this court (*Dela-ware, Lackawanna and Western Railroad Co.* v. *Daily,* 8 *Vroom* 526; *Associates* v. *Davison,* 5 *Dutcher* 418), that " a

party shall not be heard in an appellate court upon a point not taken or a matter not raised or considered by the court below." This rule is applicable to the fifth and eleventh assignments of error. The only objection to the admission of the evidence was that the proper foundation to qualify Mr. Currie to speak as an expert had not been laid. In view of Mr. Currie's evidence that he was familiar with values, and that he lived and had bought and sold property in the neighborhood, the objection has not much point.

The sixth, twelfth and thirteenth assignments must be considered together, as they relate to the same subject-matter. The proposition for which the plaintiff in error contends is that it is erroneous to ask whether, in the judgment of the witness, there was any depreciation in the value of the land that was left—i. e., of so much of the semicircular strip as was not condemned—by reason of the taking; that it is also erroneous to ask what, in the judgment of the witness, is the value of the land that so remains, and to ask what are the elements that enter into his estimation. I submit that all three inquiries are, according to well-settled rules, entirely proper.

The first question manifestly did not call upon the witness to state *what* was the amount of depreciation in value, but only whether there was *any* depreciation. After uttering the word "what," the examiner corrected himself and simply asked the introductory question whether there was *any* depreciation. The witness so understood the question, for he answers that the taking would affect the value, and then, of his own motion, without being asked, goes on to state his reasons. For this, even if objectionable, which it was not, we were not responsible. In the language of Mr. Justice Dixon, in *Sullivan* v. *North Hudson Railroad Co.*, 22 *Vroom* 542, the question being itself legal, "it was impracticable to restrain these excursions of the witness." Besides, the question could not affect the result unless we went further and showed what the depreciation was by finding out what, in the judgment of the witness, the land was worth before the taking and what after. This, counsel apparently denied our

right to do, but, in *Pennsylvania Co.* v. *Root,* 24 *Id.* 253, this form of inquiry is directly approved. Says the Chief Justice: "In such posture of affairs, the opinion of the farmer touching the value of the given farm before such intersection of it [by the railroad], as compared with its value subsequently, is manifestly admissible, as the difference between such values is the exact measure of the damage that has been done," and, in *Lew. Em. Dom.*, § 435, it is said: "Where a part only is taken, witnesses may state the value before and after the taking, or with and without the improvement, and may in all cases give the reasons upon which to base their opinions." I submit that this is the course uniformly followed at the Circuits.

The seventh objection is somewhat remarkable. Counsel denies the right of the court to strike out evidence after it has been once admitted against objection. He cites *Furst* v. *Second Avenue Railroad Co.*, 72 *N. Y.* 542, but this case only holds that without leave of the court counsel cannot withdraw evidence once offered. It is expressly stated in the opinion in that case that the court made no ruling when counsel proposed to have the answer stricken out. Here the order of the court was, "It may be stricken from the record."

The only objection that still remains to be considered is the ninth. It relates to the testimony given by Mr. Currie. In support of this objection, counsel said, in his printed brief used on the former hearing, that "the court, after the counsel for the railway company had proved that the deed to the Point Breeze company followed close upon the knowledge by its directors of the filed route of the railway company, ordered this testimony overruled. This deprived the railroad company of evidence competent to show the manufactured character of the claim," &c.

Counsel here asserts that the directors of the Point Breeze company had knowledge of the filed route of the railway company. There is no such evidence. There is no evidence even that Mr. Currie had such knowledge. He says he knew of the survey soon after its filing, which was, he thought, in

1885, the conveyance of the semicircular strip being made in January, 1886.   He was not asked whether he knew of it before the conveyance was made.   It does not even positively appear whether Mr. Currie was a director at that time.   The re-examination was designed to rebut even the suspicion of any improper conduct on the part of the Point Breeze company (which, however, was not shown to have had any knowledge or information on the subject), by showing that as far back as 1878 the right of way was first located between the ferry company's land and the railroad.   It was all manifestly irrelevant, and the judge, on his own motion, struck it out.

The opinion of the court was delivered by

DIXON, J.   The judgment brought up by this writ of error was rendered in the Hudson Circuit, upon trial of appeals taken by both parties from the award of commissioners appointed in proceedings which were instituted by the Bergen Neck Railway Company to condemn lands of the Point Breeze Ferry and Improvement Company.   The issue at the trial related solely to the value of the land and the damages sustained by the owner through the taking thereof, and the errors now assigned are all based upon the admission or exclusion of evidence touching that issue.

The ferry company showed title to a strip of land on Bergen Neck, about one hundred feet wide and seven hundred feet long, extending on a curve which veered from a southerly to a southeasterly direction, from the line of the New Jersey Central railroad to the shore of the Hudson river, except as it was intersected by the canal of the Morris Canal and Banking Company, which lay across its easterly end.   It also showed title to a large tract of land at the easterly end of this curved strip, lying mainly below the natural high-water mark of the river, which tract had to a great extent been filled in by the ferry company.   The land condemned by the railway company formed the westerly end of this curved strip between the line of the Central railroad and a parallel line one hun-

·dred feet east thereof.   In this state of the proofs, the ferry
·company offered evidence respecting the damage which the
tract lying east of the canal would sustain, because its possible
·connection with the Central railroad, by means of a railway
over the curved strip, would be impeded by the intervention
of the proposed railroad of the condemning company.   To
this evidence the railway company objected, on the ground
that the land taken was not a part of the tract east of the
canal, the canal separating the two, and the objection being
overruled and the evidence received, an exception was sealed.

The general principle on which damages, beyond the value
of what is actually taken, are awarded to an owner who is
compelled to part with his land for public use, is for present
purposes sufficiently indicated by the language of Mr. Justice
Garrison, delivering the opinion of this court in *Currie* v.
*Waverly Railroad Co.*, 23 *Vroom* 381 : " It is an established
rule of law in proceedings for condemnation of land, that the
just compensation which the landowner is entitled to receive
for his lands and damages thereto, must be limited to the
tract a portion of which is actually taken.   *   *   *   In the
application of this rule no practical difficulty can arise where
the tract is bounded by lands of others."

If we duly consider the legal situation before the trial court
at the time this evidence was admitted against objection, it
will be seen, I think, that the curved strip, part of which was
taken, was bounded on the east by land belonging or appear-
ing to belong to the canal company, and thereby was separated
from the tract lying east of the canal.

The peaceable possession by the canal company of the land
occupied with its canal, raised a presumption that that corpo-
ration owned the land in fee simple.   *Den* v. *Morris*, 2
*Halst.* 6 ; *Sullivan* v. *Sullivan*, 66 *N. Y.* 37, 41.

If the fact that the company's charter, which was a public
statute, gave the company power to acquire land by condem-
nation, would prevent this usual presumption, still there
would certainly arise a presumption that the land was ob-
tained in the mode prescribed by the charter.   Under this

enactment, passed December 31st, 1824, and a supplemental act passed January 26th, 1828, the company was authorized to construct a canal from the Delaware river to the Hudson, and for that purpose to take " lands, waters and streams " by specified legal proceedings. Those proceedings being completed, " the estate, right, property and interest in and to the premises so appropriated," * * * became, in the words of the charter, " vested in the company, to be by them held so long as they shall be used for the purposes of said canal." The charter further declares that, at the end of ninety-nine years from its passage, the state should have the option for one year of taking the canal and appurtenances to itself at an appraised valuation, and that, in case the state should not so take it, the charter should continue for the further term of fifty years, at the end of which the canal and appurtenances should become the sole property of the state. Under these provisions, the combined title of the canal company and the state to the land occupied with the canal was a base fee and gave the proprietor the same rights and privileges as if it were a fee simple (1 *Cruise Dig.*, tit. 1, ¶¶ 76, 80 ; 4 *Cruise Dig.*, tit. 32, ch. *XXI.*, ¶¶ 9, 10), so long as the land was used for the purposes of the canal, which might be forever. This intervening title rendered the lands of the ferry company on the east and west sides of the canal, separate tracts.

But it is said the general rule above declared is not applicable to the present case, because the Morris canal is a public highway, across which the owner of intersected lands may pass from one parcel to the other, and so their unity remains. Conceding this right of passage, still it is entirely clear that the right does not extend to the construction of a railroad on or through the canal company's land. For all the purposes of a railway from the reclaimed tract east of the canal to the Central railroad, that tract and the curved strip were as distinct as they possibly could be, and yet for those purposes, and those only, were these tracts treated as a unit, and on that basis was the evidence received. In that aspect, at least, the testimony was illegal.

The fact that, at the time this testimony was admitted, there was in evidence a deed made by Currie to the ferry company, which referred to the canal company's title as an easement, has not been overlooked. Such a statement, *inter alios*, could neither affect that title nor become legal evidence of it against the railway company.

It is next contended, on behalf of the ferry company, that the charge of the trial judge cured any error committed in the reception of this testimony.

It appears that, in a subsequent stage of the trial, the railway company put in evidence the deed by which the canal company obtained title to the land occupied with its canal at that point, which deed conveyed the land to the canal company, its successors and assigns, to have and to hold so long as said land and premises should be used for the purposes of said canal. This grant showed the title of the canal company to be just what its title by condemnation would have been— the lowest title which it should be presumed to hold from the mere fact of peaceable possession. Apparently because of this deed, the trial judge changed his opinion as to the unity of the tracts lying east and west of the canal, and, in his charge to the jury, instructed them to disregard the testimony concerning damages, so far as it related to the tract east of the canal, and to estimate only the damages done to the curved strip.

We must assume that the jury obeyed these instructions; nevertheless, I think the error was not cured, because the correction came too late.

The right of trial by jury, as established among us, includes the right of counsel to discuss before the jury the issues of fact which are submitted to their decision. *Sullivan* v. *State,* 17 *Vroom* 446. Under the rulings of the court at the trial of the present case, up to the delivery of the charge, one of the issues to be submitted to the jury was the amount of detriment which the lands of the ferry company lying east and west of the canal, considered as one tract, would sustain by the taking of the land condemned, and it must be assumed

that that was the issue to which counsel directed their argument. The issue finally submitted to the jury by the judge was a materially different one—the amount of detriment to the curved strip alone, a comparatively insignificant portion of the ferry company's property. This issue counsel had had no opportunity to discuss, and they had been practically deprived of such an opportunity by the erroneous rulings of the court. Indeed, the injurious effects of this error went deeper even than to the right of discussion by counsel, for the very testimony introduced by the railway company in its defence must have been confined to the issues as the ruling of the court had shaped them. Certainly a ruling which constrained respectful counsel to sustain in proof and in argument a burden more onerous than their client was legally bound to bear, was not rendered harmless because the court ultimately told the jury that the law imposed on the party a different and a lighter task. The error should have been corrected in time to enable the defendant to meet the issue as the new views of the court presented it. Had the evidence, when received, been legitimate and its irrelevancy become apparent only on the disclosure of other facts, a motion to overrule it would, no doubt, have been necessary to make its retention erroneous; but its reception being an error, that error continued until it was eradicated under conditions which restored the substantial rights of parties. We are not unaware of the fears which some judges have entertained as to inconveniences springing out of the rule here laid down, but on consideration those fears seem to have no reasonable basis. The rule will not prevent the trial court from rectifying its mistakes when that can be done without substantial injury to litigants, and it should prevent an attempt to correct them under any other circumstances.

But even upon the theory of damages adopted at the trial, there are errors which require the reversal of the judgment.

Mr. Siedler, a witness produced by the ferry company, testified that he was connected with the railroad of an existing railroad corporation and with a projected railroad, not

stating in what capacity; that he had knowledge of the value of terminal property on the Hudson river, opposite New York; had bought properties on the line of New York bay, and was acquainted generally with the value of property in the vicinity of the Point Breeze company. On the strength of these qualifications he was asked the value of the land in that vicinity, between the Central railroad and the Morris canal, in connection with land adjacent to it having a water front, the value of the curved strip as it stood, and what the residue of it would be worth after the land required by the railway company had been taken by that company. These questions were evidently intended by the examining counsel, and understood by the opposing counsel, the court and the witness, to call for the witness' opinion, with regard to the comparative utility of the curved strip as the site of a railway, from the Central railroad to the tract lying east of the canal, viewing the strip as it was and as it would be after the construction of the Bergen Neck railroad. Lawful answers to these questions necessarily required, on the part of the witness, expert knowledge respecting the building and operation of one railroad across another, at, above or below grade. This line of examination was objected to by counsel for the railway company, on the ground that the qualification of the witness as an expert was not shown. Nevertheless, the questions were allowed, and in response the witness gave his views at length on the expense and inconvenience which would attend the construction and management of a railroad on the curved strip, after the Bergen Neck railroad was built. On these topics, we think the legal competency of the witness did not appear. Mere connection with railroad corporations and knowledge of the value of land come far short of indicating expertness on the special subjects with which the witness was permitted to deal. *Pennsylvania Railroad Co.* v. *Root*, 24 *Vroom* 253; *Laing* v. *United New Jersey Railroad and Canal Co.*, 25 *Id.* 576.

For these errors, the judgment below must be reversed.

*For affirmance*—THE CHIEF JUSTICE, DEPUE, KRUE-
GER.   3.

*For reversal*—THE CHANCELLOR, ABBETT, DIXON, GAR-
RISON, LIPPINCOTT, MAGIE, REED, VAN SYCKEL, BOGERT,
BROWN, SIMS, SMITH.   12.